UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN KANE,

                    Plaintiff,          **No. 11-CV-6368(MAT)**
         -vs-                           **DECISION AND ORDER**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

_____


## I.  Introduction

     Plaintiff John Kane ("Kane" or "Plaintiff"), represented by counsel, has instituted this action challenging the decision of the Commissioner of Social Security ("Defendant" or "the Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").

## II.  Factual Background and Procedural History

     Kane applied for DIB on March 10, 2009, and for SSI on March 24, 2009, alleging disability since April 17, 2004. (196-200)[1]. These applications were denied. (81-96). A hearing was held on October 15, 2010, before an Administrative Law Judge ("ALJ"). (9-52).  The relevant evidence is set forth below.

### A.  Medical Evidence Prior to April 17, 2004

     Kane's medical history prior to the disability onset date is notable for his treatment for substance dependency and mental

_____

[1]
Numerals in parentheses refer to pages from the administrative record.

health issues, as well as a work-related back injury and left foot drop.

### 1.    Substance Dependency and Mental Health Issues

On February 4, 1998, Kane sought counseling at a Veterans Affairs ("VA")[2] mental health clinic to "help with his anger." (489). Though Kane was on parole for a federal conviction for cocaine possession, he had continued to use cocaine and alcohol, with a one-day binge every three weeks. (489) At the time, Kane was working six days a week on the production line for Wegman's bakery. (489). Anthony Ziarnowski, the head of the VA's mental health clinic, diagnosed alcohol and cocaine dependence and referred Kane to substance abuse treatment, which would be "the first step in helping him control his anger." (489) Kane was seen again on February 10, 1998, but then he apparently discontinued treatment. His case at the VA center was closed by Ziarnowski on June 4, 1998. (489-90).

Several months later, in November 1998, Kane entered Unity Hospital for substance dependency treatment after being referred by Wegman's employee assistance program and his probation officer. (624-639). Kane explained that he found himself using during the work week, which alerted him to his need for help. (626). Kane described a chronic history of self-defeating, self-destructive behavior, including chemical dependency use and an incident of

---

[2]

Kane served in the United States Marines from age seventeen to twenty, and was dishonorably discharged in 1976.

self-mutilation in 1978, when he was twenty-four. (625). Kane's intelligence/cognitive functioning was at the average to above-average level. He reported that he lived with his mother, who had struggled with mental illness over the years. (625). Dr. Donald Banzhaf and clinical social worker Carlos Bahr diagnosed Kane with a mood disorder, not otherwise specified ("NOS"); and cocaine and alcohol dependence in early full remission. (627). Anxiety disorder NOS and personality disorder NOS were "rule out" diagnoses. (627) Kane's mood was calm, with depressive affect and anxiety. (628). During the course of the substance abuse treatment, one of Kane's social workers noted that he appeared to suffer from depression and displayed some antisocial traits. (638). Kane continued treatment for seven sessions. Initially, he was motivated and very engaging; however, he eventually "broke sobriety" and stopped attending appointments. (630).

On October 5, 2001, Kane was admitted to the VA's Substance Abuse Residential Rehabilitation Treatment Program. (483). He reported a history of "serious anxiety or tension" and stated that had been treated for psychological problems once as an inpatient and once as an outpatient, but had never been prescribed medication. (479, 484, 486). It is unclear how long this course of treatment lasted or what the outcome was, as the Court was unable to find a discharge summary in the medical records.

Kane had a second admission to the VA's Substance Abuse Residential Rehabilitation Treatment Program beginning on July 25, 2002. The person completing the intake form indicated only that

Kane reported a history of "serious anxiety or tension". (476). Like the notes from the October 2001 residential treatment program, the notes from this admission are sparse.

### 2. Physical Health Issues

Chiropractor Dr. David Heffer saw Kane on September 29, 1998, who presented with complaints of low back pain and weakness in his left foot and toes, which had worsened during his shift at Wegman's bakery four days earlier. Dr. Heffer diagnosed lumbar disc displacement/herniation, lumbar segmental dysfunction/subluxation, and lumbar sprain/strain. (651). Radiological examination revealed mild degenerative changes at L4 and L5-S1. (654). Magnetic resonance imaging ("MRI") the following month revealed a small left paracentral disc extrusion at L5-S1, but neurosurgeon Dr. James Maxwell did not believe this was related to Kane's foot drop. (646).

Over the next two years, Kane treated with a number of doctors regarding his back injury and foot drop. See (646, 655-61, 679-80). Independent medical examiner Dr. Richard DellaPorta examined Kane on January 19, 1999, and diagnosed left foot drop due to left peroneal nerve neuropathy. (657-59). Dr. DellaPorta saw Kane again on August 1, 2000, and assessed a mild partial disability. Dr. DellaPorta stated that Kane should not work at heights, engage in repetitive bending or twisting of his back, or lift weights over 50 pounds. (672, 674).

On August 8, 2000, Dr. William Beckett saw Kane for his complaints of lower back stiffness, intermittent back pain, and

related insomnia. (541-42). At that time, Kane was working as a dishwasher at Dinosaur Barbecue, could walk without difficulty, could sit and stand, but could not bend frequently or lift repetitively. (541-42) Dr. Beckett advised Kane to avoid lifting weights of more than 25 pounds and refrain from repetitive lifting, bending, twisting, and reaching overhead. Kane also was limited to pushing/pulling weights under 100 pounds, using wheeled carts on flat, level surfaces. (542).

On September 21, 2000, Dr. Heffer found that Kane had a permanent disability that left him unable to perform his work on the production line at Wegman's bakery. (675-76).

On October 2, 2001, Kane underwent a physical examination at the VA. He was working as a pizza deliverer and needed an examination for employment as a truck driver. (487-88, 749). Kane appeared anxious but was alert and oriented. (487-88) Dr. Asim Khokhar and Dr. Mary Matthew found no focal deficits, and "no limitations of movement or function." (488).

**B. Medical Evidence After April 17, 2004**

**1.   Plaintiff's Car Accident and Resultant Injuries**

Kane was struck by a car on April 17, 2004, and brought to Rochester General Hospital. (610-22). Computed tomography ("CT") scans of his skull and cervical spine were negative. Kane was diagnosed with a closed head injury/mild concussion and right leg medial collateral ligament sprain or tear. (617-19).

Orthopedist Dr. Paul Peartree examined Plaintiff on April 23, 2004, for complaints of right shoulder pain and stiffness. He

diagnosed right shoulder strain and adhesive capsulitis, with very slow improvement. (695). Dr. Peartree stated that Kane remained disabled from his previous work as a truck driver at that time. (695).

Dr. Gregory Finkbeiner saw Plaintiff on April 28, 2004, for complaints of right knee and shoulder pain. (696-97). The diagnoses included complete tear of the right medial collateral ligament, left leg contusion and closed head injury, as well as possible right medial meniscal tear and right rotator cuff tear. (696-97). Kane was temporarily totally disabled. (696-97).

An MRI of Kane's right shoulder on May 3, 2004, revealed a probable partial thickness tear of the supraspinatus component of the rotator cuff, with moderate impingement from a hypertrophic acromioclavicular joint. An MRI of his right knee revealed an apparent tear of the posterior cruciate ligament, with tibial plateau edema and probable strain of the medial collateral ligament. (699).

On May 12, 2004, Kane's range of motion had improved, but Dr. Finkbeiner nevertheless found that Kane was disabled from work for the next few months as a result of the right shoulder supraspinatus partial tear and right knee posterior cruciate ligament tear. (701). At a July 29, 2004 follow-up appointment, Dr. Peartree found that Kane's symptoms were being caused by right shoulder strain with adhesive capsulitis. Dr. Peartree said Kane would be unable to work as a truck driver for at least three months. (707).

Kane underwent extensive physical therapy for his shoulder beginning in January 2005. (713-14). By March 10, 2005, Kane had forward flexion to 100 degrees, and could lift his hands behind his head when demonstrating barbell exercises. (716). Dr. Peartree opined that Plaintiff had a partial disability, and should not lift or reach above shoulder level, or lift weights of more than 50 pounds. (716). On May 16, 2005, Dr. Peartree opined that Kane had a "mild" disability, with a 20-percent loss of use of his right arm.

## 2. Plaintiff's Mental Health Issues and Hepatitis-Related Issues

On February 12, 2006, Kane was brought to Rochester General Hospital's emergency department from the Monroe County Jail, after he scratched his forearm with a plastic spoon and said he wanted to kill himself. (602-06). Kane apparently had been arrested after a fight with his girlfriend over her substance abuse; he stated that she was high on heroin and came after him, and he slapped her back. (604). Also, he was upset at the recent death of a former girlfriend. (606). At the time of the examination, Kane denied suicidal or homicidal ideation. He described himself as a "struggling person . . . trying to find work." (605). The examiner assigned Kane a GAF of "40-45"[3] and diagnosed him as having an

---

[3]

GAF refers to the Global Assessment of Functioning, a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, i.e., how well or adaptively patients are meeting various problems-in-living. See Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., Text Revision ("DSM-IV-TR"), at 34. A GAF of 100 represents optimal functioning. A GAF in the range of 41 - 50 indicates

adjustment disorder with depressed mood. (606). Kane was discharged the following day. (606).

On May 9, 2008, Kane saw Dr. Debra Khani-Mevorach for an initial evaluation at the VA Rochester Outpatient Clinic, with complaints of stress and severe pruritus (itching) for the past five months.  Kane in fact had twice sought emergency treatment for pruritus, and was prescribed antihistamines and cortisone cream, which did not provide relief. He also used alcohol and Percocet he obtained "on the street" to dull the itching, which he has described as feeling as though there is sand underneath his skin. At the time of the appointment, Kane was working as a cab driver. (473, 475).

Kane appeared alert and oriented, with well-organized thoughts, clear and coherent speech, and appropriate affect. The pruritus presented as redness, papules, macules, and an occasional superficial ulcer on his legs and abdomen. Dr. Khani-Mevorach recommended a new laundry detergent, and prescribed doxepin and further tests to determine the cause of the pruritus. (475). Because Kane felt his itching improved when his anxiety level was decreased, Dr. Khani-Mevorach also referred him for mental health treatment. (475).

At his next appointment on May 15, 2008, however, Kane said he had not followed through with the referral or blood tests, and only

---

that the patient is presenting serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Id.

took doxepin twice because it made him tired. (471-72). It would appear that his work schedule (driving a cab from midnight until 8:00 a.m.) interfered with his treatment compliance. Dr. Khani-Mevorach prescribed low-dose prednisone at his request.

Dermatologist Dr. Craig Miller saw Kane the following day, and diagnosed generalized pruritus. However, Kane's blood test results suggested a liver impairment. (453, 464, 469, 744, 776-77). Ultimately, following a liver biopsy, Kane was diagnosed with chronic hepatitis C, with mild activity, mild to moderate portal fibrosis, and mild macrovesicular steatosis. (463-65, 467, 762-64, 794).

Kane next saw Dr. Khani-Mevorach on June 2, 2008. (467-70). He stated that he had relapsed and used alcohol again "to help [his] itching[.]" (470). When he saw both Dr. Khani-Mevorach and hepatologist Dr. Parvex Mantry on June 11, 2008, they noted his generalized itching pattern, mildly flat affect, and somewhat hypervigilant behavior. (462-63, 465-66). Dr. Mantry prescribed Atarax (hydroxyzine), with a "caution for drowsiness as [Kane drove] a cab in the night shift." (463).

On June 23, 2008, Kane saw nurse practitioner ("NP") Virginia Hanchett with complaints of continued itching and fatigue. The loratidine prescribed at a dermatology appointment on June 4, 1998, had not worked. (762). NP Hanchett diagnosed pruritus secondary to hepatitis, and prescribed narrow band UVB treatment (phototherapy). (326-27).

On July 16, 2008, Dr. Mantry diagnosed early cirrhosis of the liver. Kane's major hepatitis-related complaint at the time was severe pruritus. (453). Kane had stopped taking hydroxyzine, which he said made him sleepy and did not reduce his symptoms. (453, 753). Dr. Mantry prescribed Zoloft (sertraline) instead. (454, 752). At a dermatology appointment later that week, Kane reported that the Zoloft made him drowsy but helped with the itching. (452, 750).

Kane saw Drs. Jason Gutman and Benedict Maliakkal at Strong Memorial Hospital's outpatient hepatology clinic on July 30, 2008, noting severe pruritus and "mild" fatigue. (346-48). He denied jaundice, ascites, encephalopathy, or lower extremity edema, and had no arthralgia (joint pain), arthritis, or myalgia (muscle pain). Drs. Gutman and Maliakkal diagnosed chronic hepatitis C with mild to moderate (grade 4/6) fibrosis, and prescribed ursodiol (Urso) and hydroxyzine. They also recommended Zoloft, but Kane was concerned about drowsiness. (348, 344, 450).

On August 11, 2008, Kane told Dr. Khani-Mevorach that his itching was "much better" as the result of the phototherapy. (451). On September 10, 2008, Dr. Gutman and Dr. Maliakkal similarly reported that Kane's pruritus was improved with phototherapy and ursodiol, and he had no specific complaints. (345). On September 29, 2008, NP Hanchett noted that Kane found phototherapy "extremely helpful", he but had difficulty attending appointments due to his night-shift work schedule. (325). Kane complained of

itching again in October 2008, after missing some phototherapy treatments. (447, 813).

In December 2008, Kane experienced continued itching but had no other acute complaints or concerns. (342-43). An MRI of his liver revealed a small right lobe hemangioma, but no new lesions. (342-43). Drs. McFarland and Maliakkal increased Kane's Urso dosage to address his cirrhosis, and added Questran and cholestyramine. (343, 550-51, 586, 588).

At an appointment with Dr. Khani-Mevorach and Dr. Jennifer Frese at the VA on December 15, 2008, Kane complained of intermittent itching that was "subtle" compared to his earlier symptoms. (445). He had stopped taking cetirizine because it made him tired, and the phototherapy had ceased providing relief. (445). Kane was no longer working and was "stressed about finances." (445). Upon examination, Kane was alert, talking quickly, "bouncing from one subject to the next," constantly moving and frequently scratching. Kane reported that he had not used cocaine in one year and alcohol in six months. (445). The doctors noted that Kane's excessive fatigue could be related to his hepatitis C or to depression, and surmised that he might be bipolar.

On February 13, 2009, Kane saw Dr. Maliakkal and NP Fowler at the hepatology clinic with complaints of pruritus. Phototherapy, Questran, and Urso had helped somewhat, but had not completely resolved his symptoms. (340-41). Dr. Maliakkal prescribed Questran and Urso, and added Zoloft, Pegasys (pegylated interferon) and Ribavirin. By March 17, 2009, Kane had completed three weeks of

treatment with Pegasys and Ribavirin, and was tolerating the medication well, with "minimal side effects." (338-39). He complained of "slight" headaches and "occasional" fatigue. (339-40).

Kane saw Dr. Bojia Li and Dr. Khani-Mevorach at the VA on May 18, 2009, with complaints of chronic back pain, but said his itching was "70% improved." (810). He appeared much less anxious. (812). Kane reported "doing well" with the hepatitis C combination drug therapy, but complained of weakness and fatigue which Dr. Li said were "not unusual." (811).

At his appointment on July 28, 2009, Kane told Dr. Khani-Mevorach that he felt "moody and depressed" but wanted to continue hepatitis C treatment although he had not been adherent to the dosing schedule. (806). He stated that he did not feel he could handle daily interferon treatments because of the side effects, and said he was no longer able to work driving a cab. (806). Kane complained of arthritis pain in his knee, shoulder, and neck, and requested an inhaler for his chronic dry cough. (806). He no longer needed ursodiol or cholestyramine because his itching had "significantly subsided", apparently as a result of the interferon and Ribavirin, and was only flaring with showers. (806). Dr. Khani-Merovach observed that Kane "has had multiple traumas" in his life and accordingly that he seek counseling. (808).

By August 3, 2009, Kane's pain was primarily in his knees. (808-09). He described it as intermittent, heavy, aching, shooting pain that ranged from two to eight on a ten-point scale, was worse

with walking, and improved with lying still. Kane had discontinued Pegasys and Ribavirin after approximately 20 weeks due to the side effect of increased anxiety, without a significant decrease in viral load. (830, 834).

Psychiatric licensed clinical social worker Joseph Carlino evaluated Kane on September 1, 2009, after Kane was referred by Dr. Khani-Mevorach for treatment of a possible bipolar disorder. (802). Kane explained that he had always had mood swings and that his hepatitis C medications were "enhancing [his] emotions." (802). He reported high anxiety and depression, but his verbalizations of his problems reflected more anxiety than depression. (803). Carlino described Kane as "over reactive" to general questions, and "extremely anxious" throughout the interview. (802, 804). Kane appeared hyperactive and agitated, with a labile and expansive affect, an irritable and anxious mood, and excessive speech. (802). Carlino diagnosed anxiety disorder NOS and alcohol and cocaine abuse, in remission, with depression NOS as a "rule out" diagnosis. (804).

Kane missed his appointment on September 28, 2009. (801-02). When he returned to see Carlino at the VA on January 25, 2010, his condition remained largely unchanged from the September 1, 2009, appointment, except his speech was normal. (796-98). He struggled with being able to count backwards by 7s from 100. (797).

On January 8, 2010, Kane saw NP Fowler at SMH's hepatology clinic. He was "quite anxious" because his pruritus had returned one month after discontinuing his hepatitis C medications, which he

believed were exacerbating his underlying anxiety. (834-35; repeated at 850-51). Kane felt that he was unable to find employment because of his significant pruritus. (834). He denied fatigue, ascites (accumulation of fluid in the peritoneal cavity), hepatic encephalopathy (a worsening of brain function that occurs when the liver is no longer able to remove toxic substances in the blood), jaundice, easy bruising, or prolonged bleeding. (834). NP Fowler recommended restarting Questran and Urso, and Kane expressed interest in restarting Pegasys and Ribavirin as they had helped his pruritus. (834).

When Kane saw Dr. Khani-Mevorach at the VA on January 25, 2010, he was unemployed at the time, and was "struggl[ing] with itching 24/7 and . . . chronic fatigue." (799). Kane stated that the phototherapy "was only burning him up" and requested something to help with his anxiety and itching. (799). Dr. Khani-Mevorach offered a prescription for Atarax, which he declined due to its side effects; he agreed to try fish oil again. (799).

Psychiatrist Dr. Matthew Barry evaluated Kane on January 27, 2010. (827-29). Kane complained of being "overwhelmed" by his liver disease and itching, and said he had stopped using cocaine and drinking regularly two years earlier. (827). Dr. Barry noted that the itching had impaired Kane's quality of life and functionality; and had contributed to him having poor concentration, feeling overwhelmed and on edge, and awakening throughout the night. (828). Dr. Barry observed that Kane's cognition was grossly intact, he was oriented with an appropriate fund of knowledge, and that he

-14-

appeared "mildly anxious". (829). Kane stated that his treatment goals were to "[s]top the itching, maybe get back to work, get something to take the edge off". (829).  Dr. Barry stated that based on Kane's "genetic loading for mental illness, long [history of] being 'high strung,' with one episode of self mutilation 30 yrs ago and heavy substance use, an underlying mood disorder and[/]or characterological pathology is strongly considered." (829). Dr. Barry provisionally diagnosed anxiety disorder NOS and polysubstance dependence. (829) He listed anxiety disorder due to a general medical condition and depressive disorder as differential or "rule out" diagnoses, assessed a GAF score of 51, and prescribed Prozac (fluoxetine) for his anxiety and depressive symptoms. (829).

On March 26, 2010, Plaintiff saw NP Tiffany Main at the hepatology clinic for complaints of continued itching. (830). As NP Main noted, the pruritus had been an issue for at least the past two years, and now the symptoms appeared to be worsening. (830). Kane presented with a new symptom—a generalized rash over his entire body, except his face and scalp. (830). NP Main noted that his pruritus was "much more extensive" than in the past. (830). Kane reported that his symptoms were so severe that he was unable to sleep at night and had resorted to drinking and taking other people's prescription medications "because nothing else has helped." (830). He had started Questran and ursodiol in January, but discontinued them when they did not appear to be helping. Kane reported experiencing anxiety. (831).

NP Main determined that they should defer treatment for the
hepatitis C for the present and send Kane for testing to rule out
porphyria cutanea tarda, although NP Main felt that the itching was
in all likelihood due to the hepatitis C. (832).   On April 2, 2010,
NP Hanchett and Dr. Gilmore at the hepatology clinic prescribed
triamcinolone acetonide ointment (topical steroid) for his
pruritus, which did not help. The test for porphyria was negative.
(822).

Kane told Dr. Khani-Mevorach on April 9, 2010, that he had
stopped taking the medication prescribed to treat his itching. Kane
"admit[ted] that he is getting confused" and feels that no one is
"really explaining anything to him." (823). He last drank alcohol
the previous month, and had lost five pounds over the past four
months. (823, 826). Dr. Khani-Mevorach "urged" Kane to follow-up
with Mental Health counseling. (826). Dr. Khani-Mevorach diagnosed
Kane with an anxiety disorder and noted that his "anxiety/social
situation is interfering with his ability to treat" his hepatitis
C. (826). The doctor noted that when information is relayed to him,
"it is not retained." (826).

When he saw Dr. Khani-Mevorach on August 26, 2010, Kane again
complained of depression and anxiety, stating he was "stressed out"
because of his liver disease and itching. (819-20). Dr. Khani-
Mevorach indicated diagnoses of anxiety disorder, renal cysts,
pruritus, cirrhosis, abnormal liver function tests, alcohol and
substance abuse in remission, and hepatitis C. Kane reported that
he is "very stressed out-cannot sleep, itching all the time."

(820). Dr. Khani-Mevorach noted that Kane "cannot see the connection between Hep C and pruritis [sic]." (821). However, Kane agreed to follow up with hepatology to see if a new treatment regimen would be available. (821).

Although Kane had worked occasionally "under the table," (820), he did not feel working was possible. (820). Kane still had residual low back and neck pain, shoulder limitations from the car accident, and knee pain with squatting. (821). Dr. Khani-Mevorach noted that Carlino at the VA's mental health clinic had prescribed Prozac, but Kane stated that it made the itching worse. (822).

### 3.   Consultative Examinations

Psychologist Dr. Margery Baittle consultatively examined Kane on May 8, 2009. (590-94). Kane reported that he was taking ursodiol, Prevalite (cholestyramine), Ribavirin, interferon, and sertraline. He had last worked as a truck driver in 2004, and had used alcohol and cocaine two or three months earlier. Kane told Dr. Baittle that he had "very minimal socialization" because "most of his friends [were] on drugs, and he [did] not want to be involved." (591-92). He took care of himself, did "some cooking" and general cleaning, washed laundry, and shopped, but did not drive and spent his days "sleeping and eating" as his medications "make him tired and also sick." (592).

Dr. Baittle noted that Kane was well-oriented, well-groomed, and made good eye contact, with rapid but clear speech and adequate expressive and receptive language. (591-92). Although cooperative, he was somewhat belligerent, with an irritable mood and some

paranoid thought patterns. (592). Attention, concentration, and memory were intact; he could count and perform simple calculations and serial threes, and could remember three objects immediately and after five minutes, as well as six digits forward and four digits backward. (592). Cognitive functioning "seem[ed] average to low average" with his general fund of information "somewhat limited." (592). Dr. Baittle rated Kane's insight as "[f]air" and his judgment as "[p]oor." (592).

Dr. Baittle diagnosed intermittent explosive disorder[4] as well as alcohol and cocaine abuse in remission. (593). She opined that Kane could follow and understand simple and "fairly complex" instructions, could maintain attention and concentration "quite well," and could "probably learn some new things." (593). However, Dr. Baittle found, Kane did not currently "make appropriate decisions, relate well with others, or deal appropriately with stress. . . ." (593). Dr. Baittle stated that the results of her examination "appear[ed] consistent with psychiatric problems" which "may significantly interfere with [Kane's] ability to function on

---

4

    "Intermittent Explosive Disorder (IED), as operationalized in DSM-IV, is characterized by recurrent episodes of serious assaultive acts that are out of proportion to psychosocial stressors and that are not better accounted for either by another mental disorder or by the physiological effects of a substance with psychotropic properties." http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1924721/. (last accessed Sept. 24, 2012). IED has been found to be "significantly comorbid with most DSM-IV mood, anxiety, and substance disorders." Id.  See also http://www.nimh.nih.gov/science-news/2006/intermittent-explosive-disor der-affects-up-to-16-million-americans.shtml (last accessed Sept. 24, 2012).

a daily basis." (593). In her opinion, Kane's prognosis was "[g]uarded, given his physical condition, recent alcohol and cannabis[5] disuse, and angry demeanor." (593). Dr. Baittle recommended psychotherapy through the VA.

Internist Dr. Sandra Boehlert also consultatively examined Kane on May 8, 2009. (595-98). Plaintiff complained of eye trauma in 1985 that he said caused intermittent pain and reduced vision in his right eye, as well as right shoulder stiffness and pain with forward lifting, right knee stiffness and pain, low back pain, cirrhosis, and hepatitis C. (595). He reported a history of bronchitis and borderline diabetes, and denied currently using alcohol, tobacco, or street drugs. He dressed and cooked daily, and could clean, wash laundry, and shop. However, he had someone do it for him. (596). He watched television, listened to the radio, sat in his yard, and socialized with friends. (596).

Kane's gait and stance were normal; he could rise from a chair and walk on heels and toes without difficulty, could squat halfway with good strength, and could change his clothing and get on and off the examination table unaided. (596). Kane had full range of motion in his cervical spine, and hips, knees, and ankles bilaterally. (597). He had full range of motion in his left shoulder, as well as full abduction, abduction, and internal and external rotation on the right; however, forward elevation of his

---

[5]

There is no indication in the record that Kane used cannabis. It appears to be a typographical error and that Dr. Baittle intended to say "cocaine" instead.

right shoulder was limited to 80 degrees. (597). Lumbar spine flexion was limited to 75 degrees, with lateral flexion and rotation to 25 degrees bilaterally. (597). Straight-leg-raise testing was negative. (597). Plaintiff's joints were stable and non-tender, with no redness, heat, swelling, or effusion; his reflexes were physiologic and equal in all extremities, with no atrophy or motor or sensory deficit. (597). Hand and finger dexterity was also intact, with full (5/5) grip strength bilaterally. (597). A cervical spine x-ray revealed degenerative spondylosis at C6-C7, while a right knee x-ray was negative. (599-600).

Dr. Boehlert diagnosed right rotator cuff abnormality with decreased range of motion, right knee stiffness, low back pain with intermittent radiating pain and right leg numbness, hepatitis C with cirrhosis, intermittent right eye pain, and borderline diabetes. (598). She opined that Kane had "mild" limitation in heavy ambulation, twisting and turning of the lumbar spine, and in heavy lifting, pushing, or pulling in a standing position. (598). She also opined that Kane had "moderate" limitation in reaching forward with the right arm above chest level, and "mild" limitation in any exertional activity during hepatitis C treatment. (598). Notably, there is no discussion of the pruritus in Dr. Boehlert's report. In fact, it appeared that Dr. Boehlert completely ignored this condition, as she stated that Kane's "[s]kin exam [was] within normal limits." (596).

On July 2, 2009, "T. Harding, Psychology" filed out a Psychiatric Review Technique form.[6] (730-43). It is entirely blank except that on the first page, Harding checked the box indicating "Impairment(s) Not Severe." (730). This document demonstrates that Harding did not perform even a cursory review of Kane's records. Moreover, it conflicts with the findings of both Dr. Baittle, the consultative psychologist; Dr. Boehlert, the consultative internist, who referred to Dr. Baittle's report for "complete details" of Kane's limitations; and the ALJ herself, who considered Kane's mental impairments to be severe for purposes of step two of the disability analysis.

## C.   Testimony by Plaintiff and the Vocational Expert

Kane was 48-years-old on his alleged disability onset date, and 54-years-old at the time of the ALJ's decision. (196, 198). He had a GED diploma, and had worked on an assembly line, as a truck driver, and as a garbage collector. (16-19, 239, 241-45, 265-66). After his asserted onset date, he worked part-time for "a few weeks" delivering food. (18, 241-42, 277). He also testified that he drove a taxi, but only for "a 10-day probationary" period. (21).

In an April 2009 report submitted in connection with his application, Kane said he lived with his mother. (254-264). Kane explained that pain in his shoulder, back, and knee affected his

---

[6]

The Psychiatric Review Technique Form is a standard SSA document on which psychiatric experts, including non-examining consultative psychiatrists, record their conclusions about a claimant's mental impairments and limitations. See Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520(e)(1)).

ability to lift, stand, walk, sit, climb stairs, kneel, squat, and reach. He also reported occasional burning pain in his eye. (259-60, 262-63). Kane estimated that he could walk "less than a mile" before needing to rest for 10 minutes. He stated that he was able to follow both spoken and written instructions and was unaffected by stress or changes in schedule. Kane stated that he took interferon, Ribavirin, Zoloft, and Prevacid. These medications made him tired. He did not take any medication for pain. (260, 263-64).

With respect to daily activities, Kane related that his pain affected his sleep and his ability to dress himself. He rarely showered due to his pruritus, instead taking sponge baths. He could care for his hair, shave, feed himself, and take care of his personal needs and grooming. (255-56). He prepared simple meals including cereal and microwavable food, did laundry, shopped monthly for an hour at a time, traveled alone on public transportation, and could ride in a car but not drive. (256-58). During the day, he watched television and listened to music. Although he visited friends only when given a ride, he spoke to them daily by phone and related no problems getting along with others. (259-61).

Kane testified that he was disabled because of constant itching, because he was preoccupied with his pruritus, and because he was "tired all the time," and because he had shoulder and lower back pain. (22, 27, 30, 32). Kane explained that he had difficulty concentrating because of the itching, and became withdrawn.

(37-38). Kane stated that the chronic nature of his itching does not allow him to read or concentrate as the sensation "drives [him] crazy, takes [him] over". He believes that other people "shy away" from him in public due to his itching, and he tends to get irritable sometimes with people also. He explained that he ceased taking psychotropic medications because they caused him to become more irritable, more fatigued, and more prone to itching.

The interferon also caused "depression, irritability, [and] mood disorders." (23, 25, 40). However, Kane stated that he planned to restart interferon treatment "in the next month" after the hearing. (24). He had received no treatment recently for his back pain, and he was not taking pain medication because of his liver disease. (26-27). Kane admitted that he last had a drink three or four months earlier. He had not used drugs for "years." (26).

Kane testified that he could sit for an hour or hour and a half, could stand and walk for the same amount of time, and could carry a gallon of milk. (28; but see 40-41) (stating in response to questioning by his attorney that he could walk less than a mile). Kane reported limited ability to reach overhead with his right arm, and said that he could not squat for "too long." (29). With respect to daily activities, Kane said he watched television and slept; he also dressed himself, took sponge baths, shopped at a grocery store across the street, and shared household chores with his mother. (30, 32, 25). He could drive a car but not for "long hours" because of fatigue. He usually borrowed a car for medical appointments. He had driven the previous week. (15-16).

Vocational expert ("VE") Dr. Luther Peersol also testified at the hearing. (42-52). The ALJ inquired about a hypothetical individual with Kane's education and work experience, who was limited to light work, except that he could only occasionally squat, crouch, crawl, kneel, and reach overhead with his dominant right arm. The individual was also limited to simple, routine, repetitive tasks; should rarely be exposed to extreme heat and humidity; and had only occasional interaction with coworkers, the public, and supervisors. In response, the VE testified that this hypothetical individual could perform light, unskilled work as a sorter (Dictionary of Occupational Titles ("DOT") No.789.687-146), or as a checker or examiner (DOT No. 222.687-010). (44-46). The VE further testified that more than 400,000 jobs existed nationally and more than 10,000 locally for the first occupation, and that more than 420,000 jobs nationally and more than 4,000 locally for the second. (44-45). The VE noted that his testimony was not in conflict with the DOT, with the caveat that the DOT does not refer to the social interactions required of the listed occupations.

### D.    The ALJ's Decision

On November 9, 2010, the ALJ found Kane not disabled. (56-75). The ALJ first noted that Kane was insured for DIB through December 31, 2009. (61). At step one, the ALJ found that Kane had not engaged in substantial gainful activity since April 17, 2004, his asserted date of onset. The ALJ also found that Kane had severe impairments including degenerative joint disease of the right knee,

right shoulder capsulitis, hepatitis C with pruritus, cirrhosis, anxiety, and polysubstance abuse in partial remission. (61-63).

However, the ALJ determined that none of these impairments, singly or in combination, met or equaled the requirements of an impairment listed in Appendix ("App") 1 of 20 C.F.R. Part ("Pt") 404, Subpart ("Subpt") P. (64-65). With regard to Kane's right shoulder pain, the ALJ found that it did not cause the severity of signs or symptoms necessary to meet Listing 1.02B, which requires a major dysfunction of one major peripheral joint in "each" upper extremity. (64). Kane's back impairment did not cause the severity of deficits to meet Listing 1.04, and his hepatitis C did not cause the severity of deficits to meet any subpart of Listing 5.05. (64). With respect to Kane's mental impairments, the ALJ considered them singly and in combination against the rubrics of Listing 12.04 (affective disorders), and Listing 12.09 (substance addiction disorders)[7] of 20 C.F.R Pt. 404 Subpt P, App 1, Pt A. The ALJ found that Kane did not fulfill these criteria.

The ALJ next followed a two-step process to determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Kane's symptoms and, if so, the extent to which they limited his ability

---

[7]  "Section 12.09 classifies substance addiction disorders where either behavioral or physical changes associated with the regular use of substances that affect the central nervous system are so severe that they cause organic mental disorders, depressive syndrome, anxiety disorders, personality disorders, peripheral neuropathies, liver damage, gastritis, pancreatitis, or seizures." Manns v. Shalala, 888 F. Supp. 470, 482 (W.D.N.Y. 1995) (citing 20 C.F.R. Pt. 404, Subpt. P, App 1, § 12.09(A)-(I)).

to do basic work activities. (66-69). The ALJ specifically discussed Kane's chronic hepatitis-related pruritus; chronic fatigue; daily pain in his lower back; right shoulder and right knee; and symptoms of anxiety (i.e., "poor concentration, poor sleep"). (66). The ALJ found that the evidence did not "fully support the functional limitations ascribed to them" by Kane. (67). Accordingly, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, except that he could only occasionally squat, crouch, crawl, kneel, and reach overhead with his right arm. (65). He could perform simple, routine, repetitive tasks, and could tolerate occasional interaction with coworkers, supervisors, and the public, and rare exposure to extreme heat and humidity. (65) Although the ALJ further found that Kane could not perform his past work, she determined, based in part on the VE's testimony, that Kane retained the capacity to perform work existing in significant numbers in the national economy. Therefore, the ALJ found Kane not disabled. (69-70).

The Appeals Council denied review on May 27, 2011, making the ALJ's decision the final decision of the Commissioner. (1-6).

## III. Applicable Legal Standards

### A.   Scope of Review

Any individual may appeal from a final decision of the Commissioner of Social Security to a United States District Court. 42 U.S.C. § 405(g). "[A]fter reviewing the Commissioner's decision, a court may 'enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision
of the Commissioner of Social Security, with or without remanding
18 the cause for a rehearing.'" Butts v. Barnhart, 388 F.3d 19 377,
384 (2d Cir. 2004) (quoting 42 U.S.C. § 405(g)).

"It is not [the court's] function to determine de novo whether
[a plaintiff] is disabled. . . . " Pratts v. Chater, 94 F.3d 34, 37
(2d Cir. 1996). Instead, the reviewing court will set aside an
ALJ's decision "only where it is based upon legal error or is not
supported by substantial evidence." Rosa v. Callahan, 168 F.3d 72,
77 (2d Cir. 1998) (alterations in original) (quotation omitted).
Substantial evidence "means such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion." Pratts, 94
F.3d at 37 (quoting Richardson v. Perales, 402 U.S. 389, 401
(1971)) (internal quotation marks omitted).

The ALJ must consider all of the relevant evidence, not only
that which supports her conclusion. See Herron v. Shalala, 19 F.3d
329, 333 (7th Cir. 1994) (noting that the ALJ may not "select and
discuss only that evidence that favors his ultimate
conclusion")(collecting cases); see also 20 C.F.R. Pt 404, Subpt P,
App 1, § 12.00(D) (stating that when considering mental impairment
listings, the ALJ "will consider all the relevant evidence in a
case record"). Where the ALJ ignores important evidence in support
of a claim, the court must reverse. See Godbey v. Apfel, 238 F.3d
803, 807 (7th Cir. 2000) ("We believe that the ALJ's decision does
not adequately consider evidence that supports Godbey's claim.
Therefore, we are not certain that the ALJ sufficiently articulated

why he rejected Godbey's evidence of disability.") (citation omitted).

**B.    Standard for Eligibility for Supplemental Security Income**

In order to establish disability under the Act, a claimant bears the burden of demonstrating (1) that he was unable to engage in substantial gainful activity by reason of a physical or mental impairment that could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment was demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3); see also Barnhart v. Walton, 535 U.S. 212, 215 (2002).

To determine disability, the Commissioner uses a five step sequential evaluation process. 20 C.F.R. § 416.920; see also Williams v. Apfel, 204 F.3d 48, 48-49 (2d Cir. 1999). The burden of proof is on the claimant at the first four steps of the evaluation. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If the claimant establishes that he is unable to perform any of his past relevant work, then at the fifth step, the burden shifts to the Commissioner who must then determine whether the claimant is capable of performing other work which exists in significant numbers in the national economy. 20 C.F.R. § 416.920; see also Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). The Commissioner considers the claimant's vocational factors and RFC, in conjunction with 20 C.F.R. Pt 404, Subpt P, App 2 ("the Grids") to determine disability. The Commissioner may rely upon the testimony of a VE to

assist in the evaluation of the claimant's non-exertional impairments on his occupational base. 20 C.F.R. §416.966e. If the claimant can perform other work, notwithstanding his non-exertional impairments, then he is found to be not disabled. 20 C.F.R. § 416.920(f).

### C.   Analysis of the ALJ's Decision

Plaintiff contends that the ALJ erroneously failed to find that he suffers from a disabling mental impairment, failed to accord the appropriate weight to the consultative psychologist's opinion, and improperly discounted his credibility.

### 1.   The Determination Regarding Plaintiff's Affective Disorders

At the severity determination, the ALJ found that Kane's mental impairment (unspecified anxiety disorder) causes "moderate difficulty in maintaining social function" and as such, it qualified as a "severe" impairment under 20 C.F.R. § 404.1520a(d)(1). (63). However, the ALJ ultimately determined that Kane's mental impairments were not sufficiently severe to be disabling.

The ALJ stated that she evaluated Kane against the criteria in Listing 12.04 (Affective Disorders) and Listing 12.09 (Substance Addiction Disorders).[8] The regulations provide that Affective

------

[8]

The structure of the listing for substance addiction disorders, 12.09, is different from that for the other mental disorder listings. Listing 12.09 is structured as a reference listing; that is, it will only serve to indicate which of the other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances. 20 C.F.R. Pt 404,

Disorders are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt 404, Subpt P, App 1, § 12.04(C).  "The required level of severity for these disorders is met when the requirements in <u>both A and B are satisfied</u>, <u>or</u> when the <u>requirements in C are satisfied</u>." <u>Id.</u> (emphases supplied). When assessing the severity of an affective disorder under § 12.04, the Paragraph B criteria will be assessed before the Paragraph C criteria, which are assessed only if the ALJ finds that the {aragraph B criteria are not satisfied. 20 C.F.R. Pt 404, Subpt P, App 1, § 12.00(A).

The ALJ thus first considered whether Kane's impairments satisfied the four broad functional areas set out in Paragraph B (activities of daily living; social functioning; concentration, persistence, or pace; repeated episodes of decompensation). As the ALJ noted, a marked limitation means more than moderate but less than extreme. 20 C.F.R. Pt 404, Subpt P, App 1, § 12.00(C). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." <u>Id.</u> (citing 20 C.F.R. §§ 404.1520a; 416.920a).

---

Subpt P, App 1, § 12.00.

The ALJ found, based on Kane's own testimony, that there was no more than a mild restriction in the first area (activities of daily living). (64). Plaintiff does not appear to dispute this particular aspect of the ALJ's ruling.

As to the second area, social functioning, the ALJ found that Kane did not exhibit more than a moderate limitation on his "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." (64). The ALJ found that although Consultative Examiner Dr. Baittle diagnosed Kane with "intermittent explosive disorder" in May 2009, and noted Kane does not like to leave his house very often, the hearing testimony made it apparent that his "reluctance stems from some sense of embarrassment over his chronic itching." (63). The ALJ further found that the "evidence suggests . . . that the claimant continues to socialize with his friends on a regular basis." (64) (citations omitted). This does not accurately represent the evidence of record. Kane did state that he spoke frequently to friends on the telephone. However, he only visited friends occasionally, when he had access to a car. Similarly, Dr. Baittle noted that Kane reported "very minimal socialization" because most of his friends were using drugs, and he did not want to be around that type of activity.

With regard to the third functional area, Kane's ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks in a work setting, the ALJ found as follows: "The evidence does not suggest

-31-

that [Kane]'s anxiety causes more than a mild restriction. . . [i]t is sufficient to note that mental status examinations did not reveal any deficits in memory, concentration, or attention at any time, and . . . [Kane] possesses the ability to manage his money and to follow educational programs on television." (65) (citation omitted). It is true that Dr. Baittle opined that Kane could follow and understand simple and "fairly complex" instructions, and could maintain attention and concentration "quite well." However, that finding seems inconsistent with Dr. Baittle's assessment that Kane's intelligence was in the average to low average range and that he appeared to have a limited fund of information.

The ALJ did not take into account the other treating physicians' observations that Kane's severe pruritus and chronic fatigue, when combined with his anxiety disorder, created substantial difficulties in his concentration. Dr. Barry noted that the itching had impaired Kane's quality of life and functionality; contributed to his having poor concentration; and led to his feeling overwhelmed, on edge, and unable to sleep through the night. Dr. Khani-Mevorach noted in 2010 that Kane struggled with itching every day, all day, as well as chronic fatigue. Kane was getting "confused", did not retain information relayed to him, and did not understand the connection between his hepatitis and his itching. Given how often he had seen health care providers for these conditions, it is doubtful that such a connection had not been explained to him. The fact that he is unable to retain and understand this information suggests increasing cognitive

impairments, which could be caused by a number of factors, including hepatic encephalopathy. That Kane is experiencing a decrease in cognitive functioning is bolstered by the fact that in 1998, his intelligence was rated by the VA as average to above average, while in 2009, Dr. Baittle estimated that he was of average to below average intelligence.

Finally, as to the fourth area, the ALJ found that because Kane's mental impairments did not cause him to seek inpatient psychiatric care at any time after he filed his application, there were no "episodes of decompensation." (65) (citations omitted). It was erroneous for the ALJ to require Kane to have sought inpatient psychiatric care in order to demonstrate an episode of decompensation. 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00(C)(4) (emphases supplied). There is nothing in the definition mandating the claimant seek hospitalization or inpatient care. See Bohn v. Comm'r of Soc. Sec., No. 7:10-CV-1078 TJM/DEP, 2012 WL 1048607, at *9 (N.D.N.Y. Mar. 5, 2012) ("[E]vidence of hospitalization, though highly relevant, is not necessarily required for a finding of decompensation, nor must any hospitalization last for two weeks in order to evidence such an episode.") (citing Duell v. Astrue, No.8:08-CV-9, 2010 WL 87298 at *7 & n. 9 (N.D.N.Y. Jan. 5, 2010) (citing Kohler v. Astrue, 546 F.3d 260, 268-69 (2d Cir. 2008)) (internal quotation omitted). Here, Kane has had several incidents in the past which could amount to episodes of decompensation. He had an incident of self-mutilation in 1978, and was admitted to a residential substance abuse treatment program twice in 2002. See

Frankhauser v. Barnhart, 403 F. Supp.2d 261, 277 (W.D.N.Y. 2005) ("[T]hat the majority of Plaintiff's decompensations have been precipitated by substance abuse does not undermine the fact that the record establishes that Plaintiff suffers from bipolar and personality disorders that exist apart from his substance abuse."). In 2006, he was hospitalized after scratching himself with a plastic spoon and threatening suicide. Although he was discharged the following day, that does not mean this incident could not qualify as an episode of decompensation. See Bohn, 2012 WL 1048607, at *9 ("[T]he regulation also allows for the possibility of such a finding [of episodes of decompensation] with more frequent episodes of shorter duration (or less frequent episodes of longer duration) through use of judgment as to the effect of such episodes.") (citing 20 C.F.R. Pt. 404, Subpt. 1, App. 1 § 12.00(C)(4)).

Since Kane's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of extended decompensation, the ALJ found that the Paragraph B criteria of § 12.04 were not satisfied. (65).

The ALJ further found insufficient evidence to establish the Paragraph C criteria, since there was no evidence that Kane had suffered from repeated episodes of decompensation in the past, and his impairments were not likely to cause an episode of decompensation in the event of even a minimal increase in mental demands or a change in his environment. (65). Contrary to the ALJ's conclusion, the evidence of record compellingly establishes that Kane is at high risk of decompensating in the event of additional

stressors, and possibly relapsing into full-blown alcohol and/or drug use. NP Main at the SMH hepatology clinic noted in 2010 that Kane's pruritic symptoms appeared to be worsening and were so severe that he was unable to sleep at night and had resorted to drinking and taking other people's prescription medications because nothing else had helped.

### 2.   Erroneous Rejection of Dr. Baittle's Opinion

The ALJ also rejected Dr. Baittle's opinion that Kane's mood and personality did not allow him to make appropriate decisions, to relate well with others, or to deal appropriately with stress. (68). Plaintiff asserts that the ALJ substituted her own "lay observations" for that of a qualified medical doctor. Dkt #8 at 6. The Court agrees.

The Second Circuit has repeatedly stated that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983); alterations and ellipsis in Balsamo; other citation omitted).

The ALJ declined to adopt Dr. Baittle's findings because they were "inconsistent with the reported ability to prepare his own food, to manage his own funds, to go to a public laundromat, and to

socialize with his friends on a regular basis." (68-69) (citation omitted). The ALJ did not cite any medical opinion to dispute Dr. Baittle's, instead relying on her own view of Kane's ability to perform simple activities of daily living. This clearly was error. See Balsamo, 142 F.3d at 81 ("We need not address whether the treating physicians' opinions bound the ALJ under § 404.1527(d)(2) because in this case the Commissioner failed to offer and the ALJ did not cite any medical opinion to dispute the treating physicians' conclusions that Balsamo could not perform sedentary work."). Moreover, the Court is hard-pressed to understand how Kane's ability to make his own food and go to a public laundromat are at all relevant to his ability to make appropriate decisions in the workplace, to relate well with co-workers, or to deal appropriately with employment-related stressors.

Although Kane did testify that he had minimal socialization in-person with friends and talked often to friends on the phone, "obviously in a work situation plaintiff would be exposed to people beyond his small, comfortable circle. One can be disabled and yet get together with friends from time to time." Mason v. Barnhart, 325 F. Supp.2d 885, 904 (E.D. Wis. 2004) (citing Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004)). "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981); see also Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir.1983) ("The claimant need not demonstrate that he is completely helpless or totally disabled.").

The ALJ also found Dr. Baittle's opinions inconsistent with
(1) Kane's ability to cooperate with Carlino, his psychiatric
social worker, in September 2009; (2) his "alleged amenability to
individual therapy sessions in January 2010 "; (3) his development
of an "easy rapport" with Dr. Barry; and (4) Dr. Barry's assignment
of a GAF of 51. (69). Again, these reasons for rejecting
Dr. Baittle's opinions are not qualified medical or psychiatric
opinions, and therefore are inadequate.

First, the ALJ has taken Kane's willingness and ability to
participate in his own psychiatric care and used it against him.
The regulations provide, however, that non-compliance with
prescribed medical treatment can be a basis for denial of benefits
if the claimant is disabled solely because he or she fails to
follow prescribed treatment. See 20 C.F.R. § 416.930; Dumas v.
Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (noting that "a
remediable impairment is not disabling"). The Commissioner cannot
have it both ways.

Second, Kane's ability to interact with his therapists in a
collaborative environment is not predictive of his ability to
interact with superiors and co-workers in a competitive employment
setting, or to respond appropriately to the stresses and demands of
the workplace. Cf. Hodes v. Apfel, 61 F. Supp.2d 798, 806 (N.D.
Ill. 1999) (A court "cannot uphold [the ALJ's decision] if 'the
reasons given by the trier of fact do not build an accurate and
logical bridge between the evidence and the result.'") (quoting
Sarchet v. Chater, 78 F.3d 305, 307 (7th 1996)).

Third, a GAF of 51 is on the extreme low end of the 51 to 60 range, which indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). In the caselaw, claimants frequently argue that a GAF of 50 is sufficient to support a finding of disability. E.g., Turnetine v. Astrue, NO. 09-1183-WEB, 2010 WL 4025597, at *7 (D. Kan., June 3, 2010) ("'A GAF score of fifty or less, however, does suggest an inability to keep a job. For this reason, such a GAF score should not be ignored.'") (quoting Lee v. Barnhart, 117 Fed. Appx. 674, 678 (10th Cir. Dec. 8, 2004)); see also Mason, supra, n.1 ("[GAF] scores between 50 and 60 reflect an individual with moderate impairments, who may or may not be able to work; and scores below 50 are reserved for those with severe psychological and occupational impairment.") (citing Lechner v. Barnhart, 321 F. Supp.2d 1015, 1022 n. 7 (E.D. Wis. 2004) (citing Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)). A GAF of 51 thus hardly counts as compelling evidence that Kane's mental impairments are insignificant.

The ALJ also pointed to Kane's hearing testimony that he got angry "sometimes" as a reason for rejecting Dr. Baittle's assessment of intermittent explosive disorder. Again, this statement by Kane, which may represent underreporting in an attempt to make himself more sympathetic to the ALJ, does not constitute a valid contrary medical opinion and, as such, is inadequate to rebut

Dr. Baittle's opinion. Moreover, Dr. Baittle's diagnosis is consistent with the observations by Kane's treating therapists over the years that he has significant problems dealing with his anger, and that in his interactions with them he has been hyperactive, irritable, and belligerent. For instance, social worker Carlino noted in 2009 and 2010 that Kane was "over reactive" to general questions, and "extremely anxious".

Finally, Kane's ability to remember to tend to his personal hygiene, complete his share of household chores, go to a supermarket across the street daily, manage his money, and follow educational programs on television are not inconsistent with Dr. Baittle's assessment that Kane is unable to make appropriate decisions, relate well with others, and deal appropriately with stress. (69). "The ability to care for one's self is not inconsistent with a finding of disability." Mason, 325 F. Supp.2d at 904 (citing Woodford v. Apfel, 93 F. Supp.2d 521, 529 (S.D.N.Y. 2000) ("[T]he ALJ compounded his error when he concluded that Woodford could perform sedentary work because she testified that she cooked and shopped for herself, and used public transportation. 'Such activities do not by themselves contradict allegations of disability,' as people should not be penalized for enduring the pain of their disability in order to care for themselves.") (quotation and internal citation to record omitted)). Moreover, the Court does not find these activities to be relevant to determining Kane's ability to engage in full-time, substantial gainful employment in a competitive workplace. See Mason, 325 F. Supp.2d at

904 ("Plaintiff 'listens to CDs' and 'watches TV.' It is unclear how these activities could be indicative of an ability to engage in full-time work.").

In sum, the daily activities upon which the ALJ relied to find that Kane is not disabled were either unsupported by the evidence or were the sort of "minimal daily activities" that the courts have held do not necessarily contradict a claim of disability. See Balsamo, 142 F.3d at 81; Clifford v. Apfel, 227 F.3d 863, 871-72 (7th Cir. 2000). The ALJ's analysis of the medical evidence was inadequate in that it overlooked important medical evidence from Plaintiff's treating providers and the consultative psychologist, selectively chose aspects of the record that supported her conclusion, and was contrary to the applicable regulations and rulings. The ALJ also failed to support her decision with substantial medical evidence.

### 3.   The Evaluation of Plaintiff's Credibility

The ALJ found that the record did not support Kane's testimony with regard to his abstention from illegal drugs for "many years." (68). The ALJ noted that Dr. Baittle's report referred to his use of cocaine as recently as April 2009. (68) (citation omitted). "Given this inconsistency," the ALJ found, "it is difficult to credit [Kane's] allegations of severe pain-induced anxiety for any time prior to the agreement to see a mental health professional in September 2009." (68).

Plaintiff asserts that the ALJ erroneously cited the instance of cocaine use in 2009 as the sole reason for rejecting all of the other evidence of Kane's mental impairments in the record. See Dkt #8 at 5-6. Defendant argues that this was not the basis for the ALJ's rationale, stating that although the ALJ observed that the records reflected drug and/or alcohol use more recently than suggested by Kane's own testimony, the ALJ discussed the other evidence she found to indicate that Kane's mental impairments were not disabling. (61-69). See also (64-65, 68-69).

The Court agrees with Kane that the ALJ erroneously discounted his credibility based on what she described as a discrepancy between his testimony about his cocaine usage and his statements to Dr. Baittle during the consultative examination. A reviewing "court need not defer to a credibility determination based on a misunderstanding or one-sided view of the evidence." Mason, 325 F. Supp.2d at 902 (citing Wates v. Barnhart, 274 F. Supp.2d 1024, 1038 (E.D. Wis. 2003)). Furthermore, the ALJ must comply with SSR 96-7p in evaluating credibility. E.g., Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003). SSR 96-7p requires consideration of "the entire case record" and precludes the ALJ from disregarding a claimant's statements about the intensity and persistence of his symptoms or about the effect the symptoms have on his or her ability to work "solely because they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).

In May 2009, Kane told Dr. Baittle that he had last used cocaine in March or February 2009, and noted that he currently had very minimal socialization because most of his friends are on drugs, and he did not want to be involved. (591). At the hearing in October 2010, the ALJ asked how long it had been since he used illegal drugs. Kane replied, "that's been years." (26). The ALJ characterized Kane's answer as stating that his last cocaine usage was "many years" ago and opined that this created a discrepancy between his testimony and his statements to Dr. Baittle. Although Kane's answer suggests that he had been drug-free for a longer time, the Court finds that this alleged inconsistency, standing alone, is not a reason to wholly discount his testimony.

Moreover, it does not provide the "substantial evidence," Aponte v. Sec'y, Dept. of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984), required for this Court to uphold the ALJ's decision to discount Kane's subjective complaints regarding his mental health issues, which are consistently noted by his health care practitioner longitudinally throughout his medical records. In 1998, Kane was complaining of anger-management issues and anxiety when he sought substance-dependency counseling from the VA, which diagnosed him with a mood disorder, NOS; personality disorder, NOS; and anxiety disorder, NOS. (489, 627). In December 1999, the VA recommended individual psychotherapy with a focus on helping Kane "develop coping skills to control anger. . . ." (629). In a discharge note dated January 26, 1999, from Park Ridge Health Systems, it was noted that Kane had been "abstinent long enough

that the depression he was experiencing was not a direst [sic] result of his cocaine use or withdrawal." (638). The program coordinator noted that Kane appeared to suffer from depression and some antisocial traits. (638).

In November 2000, independent medical examiner Dr. Dellaporta provided a summary of Kane's progress to Wegman's, following his back injury. Dr. Dellaporta noted that Kane had a history of being diagnosed with an anxiety disorder. Dr. Dellaporta's conclusion was supported by Kane's medical records and was significant to Kane's clinical picture. When Kane again sought treatment from the VA in connection with his substance-dependency in 2001 and 2002, it was noted that he had experienced a history of "serious anxiety or tension." (479, 484, 486).

The ALJ's interpretation of the treatment notes in the present case was at odds with the professional opinions of the consultative psychologist and Kane's mental health therapists. Furthermore, Kane's own statements regarding his mental health issues likewise have been consistent and not exaggerated. Cf. Mezzacappa v. Astrue, 749 F. Supp.2d 192, 209 (S.D.N.Y. 2010) ("The ALJ may have correctly considered Mezzacappa's subjective claims of pain exaggerated, but the ALJ erred in totally discounting them in light of the medical evidence, especially as to Mezzacappa's knees."). The Court finds that the ALJ improperly relied upon an alleged discrepancy in Kane's testimony regarding his drug-use to disregard his complaints regarding a different impairment, i.e., his mental health history and current mental status.

-43-

## E.    Substantial Evidence of Plaintiff's Disability

After reviewing the record in its entirety, the Court concludes that there is substantial evidence to support a finding that Plaintiff suffers from an affective disorder, namely, an unspecified anxiety disorder, that is of listing-level severity. As noted, § 12.04 requires marked limitations in two of the Paragraph B criteria, or marked limitations in one Paragraph B criterion and the presence of Paragraph C criteria. "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). As detailed above in Sections A and B, the Court has found substantial evidence of marked limitations in Plaintiff's social functioning, that is, his ability to interact independently, appropriately, effectively, and on a sustained basis with other individuals. In addition, the Court has found substantial evidence of marked limitations in his concentration, persistence, and pace, that is, his ability to sustain focused attention and concentration sufficiently long to permit the timely appropriate completion of tasks commonly found in work settings.

Furthermore, contrary to the ALJ's finding, the combined effects of all Kane's ailments do result in a disability. Pursuant to the regulations, the "combined effect of all of the individual's impairments" must be considered when determining whether an

applicant has a severe injury "without regard to whether any such impairment, if considered separately, would be of such severity." 20 C.F.R. § 404.1523; see also Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995); De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 937 (2d Cir. 1984); 20 C.F.R. § 404.1523. Plaintiff's anxiety disorder and hepatitis C (particularly, his pruritus and chronic fatigue) synergistically act to prevent the efficacious treatment of either impairment. As Dr. Khani-Mevorach noted, Kane's anxiety and social situation interfere with his ability to treat his hepatitis C. Kane's hepatitis medications, which somewhat alleviate his pruritus, also make him extremely fatigued and worsen his anxiety and irritability. His pruritus increases his anxiety, tendency to become angry and frustrated, and inability to concentrate and retain information. His inability to concentrate and retain information contributes, along with his anxiety and social stressors, to being noncompliant with treatment.  The psychotropic medications prescribed to treat his anxiety and depressive symptoms reportedly worsen his pruritus and also create more anxiety. The record reveals that from the time Kane first sought mental health treatment in 1998, until the present, his cognitive function and insight appear to have decreased. In 1998, prior to being diagnosed with hepatitis C, he was thought to possess average to above average intelligence with adequate insight and judgment. In 2009, however, his intelligence was assessed as average to below average, his insight was fair, and his judgment was poor. In addition to these impairments, Plaintiff suffers from

residual physical limitations from old work-related injuries and the automobile accident, namely, degenerative disk disease, degenerative joint disease of the right knee, and right shoulder capsulitis. All of these medical factors contribute to his disability.

**F.   Incompleteness of the RFC Assessment and the VE's Hypothetical**

Although the Court finds sufficient evidence of disability in the record such that remand is unnecessary, the Court notes that there were significant errors in the ALJ's RFC and questions to the VE. The ALJ completed an RFC assessment reflecting the degree of limitation she found in the Paragraph B mental functional analysis. See SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. July 2, 1996) (stating that the mental RFC assessment used at steps 4 and 5 require a more detailed assessment by itemizing various functions contained in the broad categories found in Paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments). The RFC is determined by considering "all relevant evidence, consisting of, inter alia, physical abilities, symptoms including pain, and descriptions, including that of the claimant, of limitations which go beyond symptoms." Martone v. Apfel, 70 F. Supp.2d 145, 150 (N.D.N.Y. 1999) (citing 20 C.F.R. §§ 404.1545, 416.945). Similarly, where a claimant's treating physician has not assessed his RFC, the ALJ's duty to develop the administrative record requires that she sua sponte request this physician's opinion on the subject. Rooney v. Apfel, 160 F. Supp.2d 454, 466 (E.D.N.Y. 2001). However, it does

not appear that the ALJ sought an assessment of Kane's RFC from any of the doctors who have treated him for his various severe impairments, such as the VA or Strong Memorial Hospital's hepatology clinic.

Nor did the ALJ include all of Kane's mental and physical limitations when formulating the hypothetical presented to Dr. Peersol, the VE. In questioning a vocational expert, a hypothetical must precisely and comprehensively set out every physical and mental impairment of the claimant that the ALJ accepts as true and significant. Varley v. Sec'y of Health & Human Services, 820 F.2d 777, 779 (6th Cir. 1987). The ALJ did not consider the extent to which Kane's constant itching from his pruritus would detract from his ability to stay on-task throughout the work day. The ALJ likewise did not consider the degree of exertional limitation that will result when Kane restarts his hepatitis medications (i.e., interferon and Ribavirin).

IV. **Conclusion**

In the present case, the Court finds that the record conclusively shows that Plaintiff is disabled within the meaning of the Act. Therefore, a reversal and remand for calculation of benefits is appropriate. See Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983)(reversal without remand for additional evidence particularly appropriate where payment of benefits already delayed for four years; remand would likely result in further lengthening the "painfully slow process" of determining disability).

**V.    Orders**

For the reasons set forth above, Defendant's Motion for Judgment on the Pleadings (Dkt #6) is **denied.** Plaintiff's Motion for Judgment on the Pleadings (Dkt #8) is **granted.** The Commissioner's decision is reversed, and the matter is remanded to the Commissioner solely for calculation and payment of benefits to Plaintiff.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    September 28, 2012
          Rochester, New York